RECEIVED
MAR 31 2014
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA
BY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | |
|---|---|
| KEVIN W. YOUNG | CIVIL ACTION NO: 11-1784 |
| VERSUS | JUDGE DONALD E. WALTER |
| PAUL REVERE LIFE INSURANCE CO. | MAGISTRATE JUDGE HANNA |

## MEMORANDUM RULING

Before the Court are a Motion for Summary Judgment [Doc #51] filed by the Plaintiff, Kevin W. Young, M.D. ("Dr. Young") and a Motion for Summary Judgment [Doc. #54] filed by the Defendant, Paul Revere Life Insurance Co. ("Paul Revere"). For the reasons assigned herein, Plaintiff's Motion for Summary Judgment is **DENIED**, and Defendant's Motion for Summary Judgment is **GRANTED**. Plaintiff's claims are **DISMISSED WITH PREJUDICE**.[1]

## BACKGROUND INFORMATION

The facts of this case are generally undisputed. Paul Revere issued a disability insurance policy (No. 0102647557) with an effective date of December 10, 1993, to Dr. Young while he was completing his residency in psychiatry at Tulane University. In August 1997, Dr. Young began practicing psychiatry in Rayne, Louisiana. Dr. Young has a history of substance abuse dating back as early as 1995. Dr. Young's use of mood altering substances eventually led to an investigation by the Louisiana Board of Medical Examiners ("the Board"). On April 16, 1998, Dr. Young entered into a Consent Agreement with the Board, placing his license on probation for a period of five years and requiring that Dr. Young continue to meet certain conditions, including his abstinence from

---

[1] Plaintiff's Motion for Leave to File Limited Supplemental Memorandum [Doc. #74] is **GRANTED**.

alcohol and other mood altering substances for the remainder of his life. [Doc. #54, Ex. A].

In January 2003 the Board received reliable information that Dr. Young had relapsed, shortly before the expiration his probationary period . After a urine screen tested positive for alcohol Dr. Young agreed to enter treatment again. [Doc. #54, Ex. B]. Dr. Young has provided evidence that on May 27, 2003, the Board wrote him a letter inviting him to sign a consent order agreeing to a voluntary suspension of his license to resolve the matter without a formal hearing. [Doc. #59, Ex. A-1].[2] Dr. Young was treated at Palmetto Addition and Recovery Center ("Palmetto") from April 2003 though July 2003. [Doc. #59, Ex. A]. Dr. Young's treating physician at Palmetto, Dr. Douglas W. Cook, M.D., stated in Dr. Young's discharge papers that he was "clinically fully capable of returning to the practice of medicine with skill and safety." [Doc. #59, Ex. A-2]. Shortly thereafter, by a Second Consent Agreement dated August 19, 2003, Dr. Young's license was reinstated with a five year term of probation. [Doc. #54, Ex. B].

Dr. Young applied for total disability benefits in August 2003, after he was released from treatment. Paul Revere paid Dr. Young total disability benefits from July 2003 through December 11, 2003. [Doc. #59, Ex. A-4]. Thereafter, Paul Revere paid Dr. Young residual disability benefits from August 1, 2004 through November 1, 2004. [Doc. #59, Ex. A-5 and A-6]. Dr. Young states in his affidavit that Paul Revere paid him residual disability benefits because he had a restriction on the number of hours he could practice per week. However, the court notes that Dr. Young has only provided copies of the monthly statements which are devoid of the reasoning behind the payment.

---

[2] The letter states that once signed the Consent Order would become public record. The court notes that Dr. Young requested a copy of his record from the Board. The Board provided Dr. Young with a copy of "all of the information that can be disclosed under state law." [Doc. #59, Ex. B-1]. The consent order associated with the May 27, 2003 letter was not produced by the Board.

2

[Doc. #59, Ex. A].

On October 13 2006, after the Board received reliable information that Dr. Young violated the terms of the Second Consent Agreement by possessing controlled substances, the Board ordered the immediate suspension of Dr. Young's license to practice medicine in the state of Louisiana. [Doc. #54, Ex. D; Doc. #59, Affidavit of Travis Broussard, Ex. 1]. The Board found that "Dr. Young violated the terms and conditions imposed on his license and currently suffers from conditions that materially compromise his capacity to practice medicine with reasonable skill and safety to patients." *Id.* The Board decided that emergency action was imperative to safeguard the public's health, welfare and safety. *Id.*

After the 2006 suspension of his license, Dr. Young filed a claim for disability benefits. Paul Revere continuously paid Dr. Young total disability benefits in the amount of $7,820.00 per month from January 9, 2007 through June 1, 2011. The administrative records reveals that while disability benefits were being paid representatives from Paul Revere were monitoring Dr. Young's sobriety efforts as well as his possible future plans to have his medical license reinstated. Paul Revere was aware that Dr. Young could not attempt to reapply for his medical license until he had completed two years of sobriety. [Doc. #57, PRL-CL-001432-001433, PRL-CL-001440-001441]. Paul Revere's reviewing physician, Dr. Lloyd F. Price, also agreed with this restriction, opining that given Dr. Young's history it was reasonable that he be restricted from practicing medicine until he reached two years of sobriety. [Doc. #57, PRL-CL 001434].

Dr. Young's treating physician, Dr. Jay Weiss, periodically completed questionnaires for Paul Revere upon request. Dr. Weiss also forwarded medical records to Paul Revere upon request. In May 2011 Dr. Weiss provided updated medical records to Paul Revere, which included a letter from

himself to the Board dated April 6, 2011. In the letter Dr. Weiss provided the following evaluation of Dr. Young:

> On objective evaluation, Kevin is clean, neat, on time, well dressed and well groomed, alert and oriented without evidence of abnormal thought processes or intoxication. Mood appears euthymic and affect appropriate to mood with normal range. Cognition, judgment, insight and memory are intact. He would like to return to practice if his Board will grant him permission to do so.
>
> I believe that Kevin is clean and sober at this time. I believe that he will be qualified to return to practice with skill and safety from an addiction standpoint in May of 2011. I assess him in stable sobriety with a good prognosis at this time. I filled out a disability form for him as requested. I again note that he will have two years of negative hair tests in May of 2011. I have no objection to a discussion of a possible return to practice during an appointment with Ms. Alleman which he plans to schedule in 2011. Meanwhile he is working on the required continuing medical education requirements because he knows that these will have to be accomplished prior to return to practice should the Board grant him permission to do so.

[Doc. #54, Ex. E].[3][4]

On April 6, 2011, Dr. Weiss also completed an Attending Physician Individual Disability Status Update form which was submitted directly to Paul Revere. Dr. Weiss answered "n/a" to the questions on the form concerning whether Dr. Young had any restrictions or limitations. [Doc. #57, PRL-CL-00154]. Dr. Weiss also answered "Yes" in response to the question of "whether the patient [has] returned to his/her prior level of functional ability at this time." *Id.*

---

[3] Dr. Weiss consistently opined to the Board that Dr. Young would be capable of returning to practice after he had completed two years of sobriety. May 2011 marks the first instance since the approval of Dr. Young's disability claim in January 2007 that Dr. Young maintained two years of sobriety.

[4] Dr. Weiss states in an affidavit that he advised the Board that in his professional opinion Dr. Young was fit for consideration to return to the practice of medicine, but only in a restricted capacity. [Doc. #51-6, Ex. C]. Dr. Weiss also states in his affidavit that he and the Board mutually recommended that Dr. Young complete a Post-Graduation Year Four (PFY4) supervised residency program before returning to independent practice. *Id.*

4

On May 26, 2011, at the request of Paul Revere, Dr. Price performed another review of Dr. Young's current restrictions and limitations. In performing his review Dr. Price considered Dr. Weiss' April 6, 2011 letter to the Board as well as Dr. Weiss' April 6, 2011 Attending Physician Individual Disability Status Update. Based on this information Dr. Price opined that Dr. Young's medical records "do not support continuing psychiatrically based, work related restrictions and/or limitations at this time." [Doc. #57, PRL-CL-001552-001553]. Dr. Price also found that "but for lack of licensure, insured would be able to practice his profession at this time." *Id.*

Paul Revere determined that Dr. Young would not be eligible to receive disability benefits beyond June 1, 2011. [Doc. #57, PRL-CL-0015562-0015566]. Specifically, Paul Revere found that Dr. Young no longer suffered from restrictions or limitations that would preclude him from performing the important duties of his occupation. Paul Revere noted that Dr. Young's license had not been reinstated, but found that the mere absence of a medical license does not constitute "total disability" which is "the inability to perform the important duties of your occupation due to an injury or illness."[5] *Id.* Paul Revere's letter to Dr. Young informing him of its decision to terminate his benefits stated that if Dr. Young disagreed with the determination he or his physician could provide additional information in support of his claim, or he could appeal the decision. [Doc. #57]. Neither option was taken by Dr. Young. Instead, Dr. Young sought the advice of counsel and filed suit against Paul Revere for breach of contract, specific performance, damages, penalties, costs, and

---

[5] Dr. Young has pursued reinstatement of his medical license. By Consent Agreement dated April 16, 2012, the Board issued a temporary permit to allow him to practice psychiatry only within the scope of a medical training facility. [Doc. #51, Ex. A-7]. Dr. Young completed one year of retraining and supervision at LSUHSC-Shreveport without compensation. [Doc. #51, Ex. A]. On June 7, 2013, the Board reinstated Dr. Young's license to practice with a probationary period of five years. [Doc. #51, Ex. A-8].

attorney's fees. [Doc. #1]. This court previously determined that the disability policy is not subject to ERISA. [Doc. #33].

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) directs that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict for either party. *Id.* The court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mutual Auto Insurance Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

The moving party bears the initial responsibility of informing the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309 (5th Cir. 1999). The moving party need not produce evidence to negate the elements of the non-moving party's case, but need only point out the absence of evidence supporting the non-moving party's case. *Celotex Corp.*, 477 U.S. at 325; *Lawrence*, 163 F.3d at 311.

Once the moving party carries its initial burden, the burden then falls upon the non-moving party to demonstrate the existence of a genuine dispute as to a material fact. *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory or unsubstantiated allegations, or by a mere scintilla of evidence. *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations

6

omitted). The non-moving party "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (citations omitted).

## LAW AND ANALYSIS

The parties are in agreement that Louisiana law governs the interpretation of the disability policy. Under Louisiana law an insurance policy is a contract between two parties and should be construed in accordance with the general rules of contract interpretation as set forth in the Louisiana Civil Code. *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La. 2003). Individual words and phrases used in an insurance policy are to be construed using their plain, generally prevailing meaning. La. Civ. Code art. 2047. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050.

"When the words of the policy are clear and explicit and lead to no absurd consequences, the contract must be enforced as written and no further interpretation may be made in search of the parties' intent." La. Civ Code art. 2046. Ambiguous policy provisions are generally construed against the insurer and in favor of coverage. La. Civ. Code art. 2056; *Cadwallader*, 848 So.2d at 580. The insured bears the burden of proving a policy affords coverage for an incident, while the insurer bears the burden of proving the applicability of an exclusionary clause within a policy. *Jones v. Estate of Santiago*, 870 So.2d 1002, 1010 (La. 2004).

Dr. Young maintains that Paul Revere is in breach of the clear and unambiguous terms of the

policy because he meets the conjunctive definition for "total disability".[6] Dr. Young maintains that he is unable to perform the important duties of his occupation because he lacks the ability, means, and power to practice medicine as an *independent* psychiatrist [Doc. #51]. Dr. Young notes that the term "unable" has a general definition of "not able; lacking the ability means or power to do something.." [Doc. #51; citing Webster's College Dictionary (4th Ed. 2001)]. Dr. Young also notes that he has continuously been under physician's care for his disability since 2006.[7] Moreover, Dr. Young maintains that his lack of a medical license is a direct result of his Injury or Sickness and is a collateral consequence (i.e. because of) of the same Injury or Sickness that prompted Paul Revere to originally commence the payment of monthly total disability benefits.

Paul Revere stands by its decision to terminate disability benefits, arguing that Dr. Young is not entitled to total disability benefits under the terms of the policy because Dr. Young cannot meet the threshold "causation" requirement that "because of his injury or sickness" he is "unable to perform the important duties of his occupation." [Doc. #58]. Paul Revere argues that when the disability payments were terminated Dr. Young no longer had any medical restrictions or limitations

---

[6] "Total Disability" means that because of Injury or Sickness:

    a.    You are unable to perform the important duties of Your Occupation; and

    b.    You are receiving Physician's Care. We will waive this requirement if We receive written proof acceptable to Us that further Physician's Care would be of no benefit to You.

[Doc. #51, Policy at 8].

[7] Dr. Weiss states in his affidavit that he and other physicians at Palmetto continue to treat Dr. Young every three months for the same condition related to Dr. Young's 2006 disability. [Doc. #51-6, Ex. C]. Paul Revere does not dispute that Dr. Young has continuously received Physician's Care as part of his treatment for addition.

8

which prevented him from performing every task required of his occupation. The only limitation that prevented Dr. Young from practicing medicine without supervision was his lack of a medical license. Paul Revere argues that when the benefits were terminated Dr. Young no longer had a "factual disability" caused by his injury or illness. Instead, Paul Revere classifies Dr. Young as merely having a "legal disability" (his lack of a medical license) which prevented him from performing all of the duties of his occupation.[8] Paul Revere maintains that a legal disability is insufficient to sustain disability payments.

It is the general rule in most jurisdictions that a disability policy will provide coverage for factual disabilities but not for legal disabilities. *Broussard v. Northwestern Mutual Investment Services, LLC*, 2011 WL 666293 (W.D. La. 2011) (citing 10 Couch on Insurance § 146:0 (3d ed. 1998)).[9] However, to date there is only one case in Louisiana to discuss the issue and it does not provide a bright line rule. In *Berry v. Paul Revere Life Ins. Co.*, 21, So.3d 385 (La. App. 1st Cir. 2009), aff'd, 2014 WL 322064 (La. 2014)), the court noted that the disability policy in question did not define the terms legal or factual disability, but that the State of Louisiana requires a medical license for a doctor to practice his profession. *Id.* at 390. Thus, the *Berry* court noted that the ability of a doctor to obtain a medical license *may* have a bearing on the issue of disability and the doctor's

---

[8] The terms "factual disability" and "legal disability" are judicially created terms not found within the terms of the policy.

[9] The court notes that the majority of the cases invoking the concept of "factual disability" versus "legal disability" involve professionals who apply for disability benefits *after* they have lost their professional license. In such cases many courts have found that where a legal disability exists prior to the application of benefits for an alleged factual disability coverage does not exist because the inability to practice a profession is due to the revocation of the claimant's professional license rather than a sickness as defined by the policy. *See Goomar v. Centennial Life Ins. Co.*, 855 F.Supp. 319 (S.D. Cal. 1994).

ability to perform his occupation. *Id.* (emphasis added). The court stated in pertinent part:

> There is no rule that legal impediments per se can never be a basis for disability. The issue should ultimately turn on the facts and the language of the insurance contract. If the suspension of the license arises out of the covered sickness, then it may be a basis for determining disability. Indeed, many jurisdictions are in accord that where a health-related disability, on its own, would make a return to work impossible, the existence of a legal disability, even one caused by the health-related disability, does not justify the denial of benefits.

*Id.* at 390-91.

The *Berry* court continued by quoting language from *Paul Revere Life Ins. Co. v. Bavaro*, 957 F.Supp. 444, 449 (S.D.N.Y. 1997), which states:

> If [the claimant] demonstrates to the trier of fact that he is unable to work because of his [injury or illness] then he is entitled to disability payments, despite the existence of his subsequent legal disability. If, however, the trier of fact believes that but for his legal disability he would be able to perform his occupation, then he is not entitled to disability payments.

*Id.* at 391. Unfortunately, the *Berry* court did not specifically set forth a rule for future courts to follow when presented with a similar issue. However, a careful reading of *Berry* indicates that the court focused on a factual determination of whether the claimant was capable of performing his occupation regardless of his legal status.[10]

Both parties agree that there are no significant factual disputes remaining. Thus, the court must determine as a matter of law whether Paul Revere breached the terms of the policy given the facts of this case. Upon careful consideration this Court is convinced that Paul Revere did not breach the terms of the policy. When the court considers the questions noted in *Berry* and *Bavaro*

---

[10] The *Berry* court denied summary judgment because it found that genuine issues of material fact remained as to whether Dr. Berry was able to perform the important duties of his occupation as an anesthesiologist due to his alleged risk of relapse into his opiate addition without serious risk to the health and well being of the public.

the outcome becomes clear. Has Dr. Young demonstrated that he is unable to work because of his substance abuse issues despite his legal disability? This court believes the answer to the question is "no", which would preclude disability payments. Conversely, do the facts suggest that but for Dr. Young's legal disability he would be able to perform his occupation? This court believes the answer to this question is "yes", which also precludes disability payments.

Dr. Young's treating physician made a statement to the Board that he considered Dr. Young to be "clean and sober" and that "he will be qualified to return to practice with skill and safety from an addiction standpoint in may of 2011." [Doc. #54, Ex. E]. [11] However, the document the court finds most compelling is the Attending Physician Individual Disability Status Update dated April 6, 2011, which was completed by Dr. Weiss and submitted directly to Paul Revere. Dr. Weiss answered "n/a" to the questions on the form concerning whether Dr. Young had any restrictions or limitations. Moreover, Dr. Weiss also answered "Yes" in response to the question of "whether the patient [has] returned to his/her prior level of functional ability at this time." *Id.* [12] These two documents answer the questions posed in *Berry*. But for his legal disability Dr. Young would be able to perform the duties of his occupation. Thus, he is not entitled to disability benefits.

---

[11] The court takes no issue with the fact that Paul Revere obtained the letter in the context of a routine record request. The letter was part of Dr. Young's medical file and was appropriate for disclosure.

[12] The court notes that Dr. Weiss makes a contradictory statement in his affidavit from the evidence in the record. Dr. Weiss states "I have never spoken or written to anyone affiliated with Paul Revere Insurance Company regarding my professional opinion regarding Dr. Young's return to the practice of medicine". [Doc. #51-6]. However, this statement is clearly controverted by the administrative record which contains numerous Attending Physician Individual Disability Status Updates, including the April 6, 2011 update which is most damaging to Dr. Young. The form to be completed by the Attending Physician states under the heading "instructions" that "the purpose of this report is to provide us [Paul Revere] with current information regarding your patient's medical condition." [Doc. #57, PRL-CL-00154].

The court does not find the Board's requirement (or Dr. Weiss' suggestion) that Dr. Young complete one year of a post graduate supervised residency program prior to his return to independent practice to be dispositive on the issue of whether Dr. Young remained disabled when his benefits were terminated. Given Dr. Young's history of repeated suspensions and the length of time he was away from his medical practice it is reasonable for the Board to require that Dr. Young be closely monitored under the supervision of another physician within a residency program. However, a supervision requirement does not mean that Dr. Young was incapable of performing the duties of his occupation because of an injury or sickness. Likewise, the limitation to a forty hour work week by his treating physician does not equate to Dr. Young being incapable of performing the regular duties of a psychiatrist. It appears that the only thing Dr. Young continued to lack was the ability to receive compensation while completing his residency requirement to obtain his medical license. This has no bearing on whether Dr. Young could perform the duties of a psychiatrist when his benefits were terminated.

## CONCLUSION

For the reasons assigned herein, the court rules in favor of Paul Revere. Plaintiff's Motion for Summary Judgment [Doc. #51] is **DENIED**, and Defendant's Motion for Summary Judgment [Doc. #54] is **GRANTED**. Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED**, this 3/ day of March, 2014.

DONALD E. WALTER
UNITED STATES DISTRICT JUDGE